RICHARD EDWIN HEATH v. SWIFT WINGS, INC., THE BANK OF VIRGINIA
   TRUST COMPANY, FRANK W. KISH, RICHARD H. KISH AND KERMIT
   ROCKETT

No. 7824SC367

(Filed 6 March 1979)

1. **Aviation § 3.1— airplane crash—standard of care of pilot—erroneous instruction**

    In an action to recover for the deaths of two passengers in an airplane
    crash, the trial court erred in referring in the instructions to the "ordinary
    care and caution, which an ordinary prudent pilot having the same training as
    [the pilot in this case], would have used in the same or similar circumstances,"
    since such instruction permitted the jury to consider the pilot's own particular
    experience and training in determining the standard of care required of him
    rather than applying a minimum standard generally applicable to all pilots.

2. **Aviation § 3.1— deaths in airplane crash—instruction on emergency procedure—insufficient supporting evidence**

    In an action to recover for the deaths of two passengers in an airplane
    crash, testimony that a pilot is taught to switch magnetos when the airplane is
    experiencing engine roughness was insufficient to support the court's instruction that switching magnetos constituted an emergency procedure.

3. **Aviation § 3.1; Trial § 36.2— contentions of parties—expression of opinion**

    In an action to recover for the deaths of two passengers in an airplane
    crash, the trial court expressed an opinion on the evidence in violation of G.S.
    1A-1, Rule 51(a) when, in summarizing the contentions of the parties, the court
    stated that "plaintiff would have [the pilot] adhere to a perfect standard of
    care whereas the standard is that of the ordinary prudent pilot."

APPEAL by plaintiff from *Howell, Judge.* Judgment entered 7
November 1977 in Superior Court, WATAUGA County. Heard in
the Court of Appeals 31 January 1979.

On 3 August 1975 a Piper 180 Arrow airplane crashed immediately after takeoff from the Boone-Blowing Rock Airport.
Killed in the crash was the pilot, Fred Heath; his wife, Jonna;
their son, Karl; and a family friend, Vance Smathers. Valerie
Heath, a daughter of Fred and Jonna Heath, and sister of Karl,
became the sole survivor of the Heath family. This action was instituted by Richard E. Heath as ancillary administrator of the
estates of Jonna and Karl Heath against (1) Swift Wings, Inc.,
the corporate owner of the aircraft, on the grounds of agency; (2)
the four shareholders of Swift Wings, Inc.—Fred Heath, Frank

Kish, Richard Kish, and Kermit Rockett—alleging they actually constituted a *de facto* partnership, and (3) The Bank of Virginia Trust Company, Executor of the Estate of Frederick B. Heath, Jr.

The plaintiff's complaint alleged several grounds of negligence: (1) operation of the aircraft in an overloaded condition beyond its performance capabilities, (2) failure to follow the operating manual with regard to takeoff distance for short and soft field takeoffs, (3) failure to take into account specific runway and weather conditions, (4) failure to take appropriate emergency steps including aborting takeoff, (5) flying below safe speed, (6) improper control after takeoff, and (7) violation of federal aircraft safety regulations.

Defendants answered, generally denying negligence, the existence of agency, and a *de facto* partnership.

Plaintiff's evidence, except to the extent it is quoted from the record, is briefly summarized as follows: Mary Payne Smathers Curry, widow of Vance Smathers, observed the takeoff of the Piper aircraft shortly after 5:00 o'clock on 3 August 1975. She observed Fred Heath load and reload the passengers and luggage, apparently in an effort to improve the balance of the aircraft. He also "walked around [the airplane] and looked at everything . . . She remembers seeing him and thinking that he's doublechecking it to be sure no one has slashed the tires." The airplane engine started promptly and the plane was taxied to the end of the runway where it paused for approximately five minutes before takeoff. The airplane came very close to the end of the runway before takeoff. However, "[t]he engine sounded good the entire time, and she did not recall hearing the engine miss or pop or backfire." After takeoff, the airplane "gained altitude but it didn't go up very high" and then "leveled off pretty low".

Joe Maples, the golf pro at Boone Golf and Country Club, was, at the time of the crash, in his pro shop which is located 600 to 800 yards from one end of the runway. He is a licensed pilot and operates on a voluntary basis a "Unicom" radio in the pro shop to issue aircraft traffic advisories. He heard the takeoff and testified that the engine sounded normal. He observed that his thermometer at the time of takeoff registered between 78° and 80° Fahrenheit. Later on that day, he also observed that the grass appeared to have grown to a height of five to six inches on

parts of the runway, although it was worn somewhat in the middle. The soil was hard and flat. The crash occurred approximately one mile from the end of the runway. There is a gradual, unobstructed rise in the terrain to an altitude of about 200 feet within one mile from the end of the runway. Only crops, isolated trees, and drainage ditches lie on the terrain between the runway and the rise.

Joe Shuford testified that he resides in a house approximately 2,000 feet from the end of the runway from which the Piper aircraft took off. The house overlooks a cornfield which is beneath the path of aircraft departing the runway. He heard the aircraft taking off and "remarked to his wife that it seemed like it was taking a long time for the airplane to get down the runway." When the plane came in sight it was "bobbing up and down like a 'yo-yo' just above the corn. He saw the plane touch into the corn twice. The engine sounded like it was having a hard time flying." The landing gear was up. As the plane approached a set of power lines extending across the cornfield, it lifted several feet and he heard a loud "pop". The aircraft then passed between two power poles, made a right bank, the left wing struck a tree, and the aircraft continued down the valley without gaining any altitude. The plane eventually crashed near a set of power lines with which the plane apparently collided on Holiday Hills Road.

Robert Bumgardner, a representative of the local electric membership corporation, testified that at the point where they were apparently struck by the plane, the power lines were close to 30 feet above the ground. One pole had been broken some distance above the ground, the cross arm on another had been broken, and one of four power lines had been snapped.

Richard G. Rodriquez, an investigator for the National Transportation Safety Board, testified that his investigation indicated that the grass runway was firm and essentially level. The landing gear was apparently down and locked at the time of the crash. The flaps were up. He testified that the fuel was flowing to all four cylinder injectors and that a test of each magneto indicated that they were functioning properly. He concluded, "Yes, my testimony would be that we found no evidence of preimpact malfunction."

William B. Gough, Jr., a free-lance mechanical engineering consultant and pilot, testified concerning the operation and flight performance of the Piper 180 Arrow. He testified concerning the many factors affecting the takeoff capabilities of the Piper and the calculations to be made by the pilot before takeoff, utilizing flight performance charts. He testified that in his opinion, according to his calculations, the pilot should have used flaps to aid in the takeoff. Furthermore, he stated that in his opinion the reasonably prudent pilot should have made a controlled landing in the cornfield shortly after takeoff if he were experiencing difficulty attaining flight speed, and that if he had done so Jonna Heath and Karl Heath would have survived.

The defendant offered no testimony, but instead relied solely on testimony elicited on cross-examination which is briefly summarized below. Witness Joe Maples conceded that he did not hear the airplane's engine as it neared takeoff, because the takeoff was from the end of the runway fartherest from the pro shop. He also stated that he had utilized the airport on numerous occasions before he was ever aware of the power line obstructions in the cornfield. Joe Shuford testified with respect to the engine noise that, "Yes, sir, I have indicated that when I heard this 'pop' my first impression was that it was an engine backfiring." Mrs. Curry admitted that, although she testified that the engine sounded good during takeoff, she would not recognize the sound of an engine that was unable to develop full power. Mr. Rodriquez conceded, under extensive cross-examination, that there were some malfunctions which his inspection may not have detected, and would not deny absolutely that malfunction could have caused the crash. Plaintiff's expert Gough testified concerning several malfunction possibilities that could conceivably have caused power loss.

After the customary motions at the conclusion of all the evidence, the case was submitted to the jury upon voluminous instructions by the trial court. The jury returned a verdict answering the following issue as indicated: "1. Was Fred Heath, Jr., negligent in the operation of PA—28R 'Arrow' airplane on August 3, 1975 as alleged in the complaint?" Answer: "No". Plaintiff appeals assigning error to the exclusion of certain evidence and to the charge to the jury. Defendants cross-appeal assigning

error to the denial of the motions for a directed verdict by Swift Wings, Inc.

*Adams and Jenkins, by W. Thad Adams, III, for plaintiff appellant.*

*Smith, Anderson, Blount and Mitchell, by James G. Billings, for defendant appellees.*

MORRIS, Chief Judge.

Plaintiff has brought forward on appeal 15 assignments of error directed to 26 exceptions to rulings and instructions of the trial court. We direct our inquiry to a very limited number of assignments of error which identify substantial errors of law sufficiently prejudicial to the plaintiff to require a new trial of this matter. We will not address the remaining assignments of error because of the probability that the same errors, if any, will not recur upon retrial of the cause.

[1] Assignment of error No. 4 is directed to the trial court's charge concerning the definition of negligence and the applicable standard of care:

"Negligence, ladies and gentlemen of the jury, is the failure of someone to act as a reasonably and careful and prudent person would under the same or similar circumstances. Obviously, this could be the doing of something or the failure to do something, depending on the circumstances. With respect to aviation negligence could be more specifically defined as the failure to exercise that degree of ordinary care and caution, which an ordinary prudent pilot having the same training and experience as Fred Heath, would have used in the same or similar circumstances."

It is a familiar rule of law that the standard of care required of an individual, unless altered by statute, is the conduct of the reasonably prudent man under the same or similar circumstances. *See Williams v. Trust Co.*, 292 N.C. 416, 233 S.E. 2d 589 (1977); *Toone v. Adams*, 262 N.C. 403, 137 S.E. 2d 132 (1964). While the standard of care of the reasonably prudent man remains constant, the quantity or degree of care required varies significantly with the attendant circumstances. *Pinyan v. Settle*, 263 N.C. 578, 139

S.E. 2d 863 (1965); *Raper v. McCrory-McLellan Corp.*, 259 N.C. 199, 130 S.E. 2d 281 (1963).

The trial court improperly introduced a subjective standard of care into the definition of negligence by referring to the "ordinary care and caution, which an ordinary prudent pilot *having the same training and experience as Fred Heath*, would have used in the same or similar circumstances." (Emphasis added.) We are aware of the authorities which support the application of a greater standard of care than that of the ordinary prudent man for persons shown to possess special skill in a particular endeavor. *See generally* Prosser, Law of Torts (4th ed.) § 32. Indeed, our courts have long recognized that one who engages in a business, occupation, or profession must exercise the requisite degree of learning, skill, and ability of that calling with reasonable and ordinary care. *See e.g., Insurance Co. v. Sprinkler Co.*, 266 N.C. 134, 146 S.E. 2d 53 (1966) (fire sprinkler contractor); *Service Co. v. Sales Co.*, 261 N.C. 660, 136 S.E. 2d 56 (1964) (industrial designer); *Hunt v. Bradshaw*, 242 N.C. 517, 88 S.E. 2d 762 (1955) (physician); *Hodges v. Carter*, 239 N.C. 517, 80 S.E. 2d 144 (1954) (attorney). Furthermore, the specialist within a profession may be held to a standard of care greater than that required of the general practitioner. *See generally Dickens v. Everhart*, 284 N.C. 95, 199 S.E. 2d 440 (1973). Nevertheless, the professional standard remains an objective standard. For example, the recognized standard for a physician is established as "the standard of professional competence and care customary in similar communities among physicians engaged in his field of practice." *Dickens v. Everhart*, 284 N.C. at 101, 199 S.E. 2d at 443.

Such objective standards avoid the evil of imposing a different standard of care upon each individual. The instructions in this case concerning the pilot's standard of care are misleading at best, and a misapplication of the law. They permit the jury to consider Fred Heath's own particular experience and training, whether outstanding or inferior, in determining the requisite standard of conduct, rather than applying a minimum standard generally applicable to all pilots. The plaintiff is entitled to an instruction holding Fred Heath to the objective minimum standard of care applicable to all pilots.

[2] Plaintiff assigns error to the portion of the trial court's summary of the defendant's evidence as elicited during cross-

examination. Plaintiff excepts to the following statement by the court:

"That the ignition was on one of the magnetos which would indicate that the pilot, having encountered difficulty, had switched from both, which is an emergency procedure; . . ."

Plaintiff contends that the evidence did not reasonably support the trial court's statement that the pilot had initiated an emergency procedure. Defendants argue that the court drew a reasonable inference from the evidence. It is conceded by defendants that there was no testimony precisely stating that switching magnetos is an "emergency procedure".

It is fundamental in this State that the trial court may not submit for the consideration of the jury facts material to the issue of negligence not fully supported by the evidence. *Dove v. Cain*, 267 N.C. 645, 148 S.E. 2d 611 (1966). The issue of whether the pilot of the Piper 180 Arrow was in fact confronted with an "emergency" due to engine malfunction is a crucial element of the case. Testimony that a pilot is taught to switch magnetos when the aircraft is experiencing engine roughness is, under the facts of this case, insufficient evidence in this record to support the court's charge which intimated that switching magnetos constitutes *per se* an emergency procedure. Moreover, there is no evidence to suggest that engine roughness presents an emergency situation when proper safety factors are taken into consideration prior to an attempted takeoff.

[3] Plaintiff also assigns error to the following portion of the court's summary of the contentions of the parties:

"[T]hat the plaintiff would have Fred Heath adhere to a perfect exact standard whereas the standard is that of the ordinary prudent pilot; . . ."

Such a statement may appear to the jury as an indication of the trial court's opinion with respect to the merits of plaintiff's lawsuit. It is clear from the pleadings that the plaintiff is proceeding only on the theory of a failure to exercise the due care required of the ordinary prudent pilot. There is no basis for the trial court's statement that plaintiff insists on a perfect standard as opposed to a reasonable standard. This Court has held that when the manner of stating the contentions of the parties is in-

dicative of the court's opinion on the case, the charge is violative of G.S. 1-180. *Voorhees v. Guthrie*, 9 N.C. App. 266, 175 S.E. 2d 614 (1970). G.S. 1-180 is now embodied in substance within G.S. 1A-1, Rule 51(a). *Little v. Poole*, 11 N.C. App. 597, 182 S.E. 2d 206 (1971). Furthermore, exceptions to an expression of opinion within the context of the summary of the contentions of the parties may be raised for the first time on appeal. *Voorhees v. Guthrie, supra*; *State v. Powell*, 6 N.C. App. 8, 169 S.E. 2d 210 (1969).

This matter was well tried by both counsel for plaintiff and counsel for defendants, and several days were consumed in its trial. Nevertheless, for prejudicial errors in the charge, there must be a

New trial.

Judges MARTIN (Harry C.) and CARLTON concur.